✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

9:05 am, Aug 18 2022
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Scott Schoenhardt, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2017. I am currently assigned to the Violent Crime Section - Child Exploitation Operational Unit ("CEOU"). While employed by the FBI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, child sex tourism, and child pornography. I have investigated a variety of federal crimes involving child pornography, sexual exploitation of children, and cyber intrusions. I have experience regarding these federal violations through my daily investigative responsibilities, previous law enforcement employment, and extensive training. During my law enforcement career, I have been trained in numerous topics including investigation and criminal case prosecution. I have personally conducted and have been involved in numerous investigations that included the execution of search warrants involving the search and seizure of electronic media. I have received training in child pornography and child exploitation cases, including child sex tourism, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. My education includes a master's of science in cybersecurity with a concentration of digital forensics, and a bachelor's degree in criminal justice and political science with a minor in computer forensics.

2. I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to

1

conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, including violations of 18 U.S.C. §§ 2251, 2252, 2252A, 2260, and 2423.

3.  The statements in this affidavit are based in part on information provided by the FBI and on my investigation of this matter. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation. This affidavit is submitted in support of an application for a warrant to search for contraband, evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2260(a) and 2423(b) and (c). Based upon the information summarized in this application, I have reason to believe that evidence of such violations is located on the item(s) described in Attachment A.

## STATUTORY AUTHORITY

4.  As noted above, this investigation concerns alleged violations of the following:

    a.  18 U.S.C. § 2260(a) punishes a person who, outside the United States, employs, uses, persuades, induces, entices, or coerces any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct intending that the visual depiction will be imported or transmitted into the United States or into waters within 12 miles of the coast of the United States.

    b.  18 U.S.C. § 2423(b) punishes a person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, with a motivating purpose of engaging in any illicit sexual conduct with another person.

    c.  18 U.S.C. § 2423(c) punishes any United States citizen or alien admitted for permanent residence who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person.

        i.  18 United States Code, Section 2423(f) defines "illicit sexual conduct" as (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or (2) any commercial sex act (as defined in section 1591) with a person under 18 years of age.

2

## ITEMS TO BE EXAMINED

5. The property to be searched consists of the contents of electronic devices seized from JOHN REIDY on or about July 17, 2019, by the Cambodian National Police ("CNP"), namely: one (1) Samsung Galaxy J1 Mini, IMEI: 355002085492947) and one (1) Samsung SGH-T769, IMEI: 359196046280841 (hereinafter referred to as the "TARGET DEVICES"). A hard drive containing forensic extractions of these cell phones was provided to the FBI by the CNP and is currently under the control of the evidence custodian located at the FBI Child Exploitation Operational Unit located at 801 International Drive, Linthicum Heights, MD 21090. The original devices remain under the custody and control of the CNP.[1]

6. The applied-for warrant would authorize the seizure of these devices and the digital forensic examination of data particularly described in Attachment B which is electronically stored on the devices.

## PROBABLE CAUSE

7. There is probable cause to believe that JOHN REIDY traveled to Cambodia with the intent to engage in sexual acts with minors and that he resided there and engaged in illicit sexual conduct with minors, including a minor male victim ("V1") while V1 was under the age of 16.[2] There is probable cause to believe that he produced visual depictions of V1 engaging in sexually

---

[1] The FBI has requested the original electronic devices from the CNP upon the conclusion of their criminal court proceeding regarding REIDY once the case and any subsequent appeals are finalized.

[2] Minor Victim 1's real identity is known to your affiant, but I have not included identifying information about V1 to protect his privacy. According to V1's birth certificate he was born in Cambodia on June 6, 2003. Approximately February 11, 2020, during REIDY's criminal trial in Cambodia, V1's aunt identified V1's actual birth date as July 6, 2005.

3

explicit conduct while he was a minor under the age of 18 with the intent to bring those visual depictions back to the United States. There is probable cause to believe that evidence of these crimes will be found on the extractions of the devices listed in Attachment A.

8. The CNP received information indicating that a U.S. citizen, JOHN REIDY, had been associated with Cambodian minor boys during his visits to the country. The boys were reportedly between approximately ten and seventeen years old. The CNP interviewed several minors, including V1, who disclosed that he was sexually abused by REIDY at his residence in Siem Reap, Cambodia. On or about May 11, 2019, V1 was interviewed by a child/adolescent forensic interviewer regarding his contact with REIDY. V1 disclosed REIDY took photographs of him with a Samsung cell phone while V1 was lying naked on a bed and that REIDY paid money to have sex with him.

9. On or about July 17, 2019, the Cambodian National Police executed a search of REIDY's residence, a rented room located in the Ta Phul Village, Svay Commune, Siem Reap, Cambodia and seized a Samsung Galaxy J1 Mini and a Samsung SGH-T769. On or about July 18, 2019, the CNP arrested REIDY for violations of Cambodian Criminal Code, Article 239: Purchase of Child Prostitution, Rape and Child Pornography.

10. On or about February 11, 2020, V1 testified at REIDY's criminal trial on these charges in Siem Reap, Cambodia. V1 testified he first met REIDY in Siem Reap when REIDY asked him if he was homeless and offered him a place to live. REIDY took V1 to his guesthouse and provided V1 with a cellphone and paid him $10 to have sex with him. V1 had sex with REIDY on seven or eight separate occasions and REIDY provided him with $10 each time. During one of the occasions, REIDY inserted an artificial penis in V1's anus and V1 testified that REIDY took photographs of them while they were having sex. The CNP identified approximately three

to four images of child pornography during their forensic examination of REIDY's devices and the CNP identified V1 in the photographs.[3] During the criminal trial, the judge showed V1 a photograph of a naked boy that had been recovered from REIDY's phone. V1 looked at the photograph and identified himself as the naked boy in the photograph.

11. During this same trial, REIDY testified. He first stated that he had relocated to Cambodia from Massachusetts because it was much less expensive to live there. He stated that he had to leave Cambodia every thirty days to renew his visa. He identified V1 in the court room and stated they had performed oral sex on each other on two or three occasions but denied paying V1 for sex. REIDY testified that V1 told REIDY that he was eighteen years old and married and stated that he would not have had sex with V1 if he'd known he was a minor. The judge showed REIDY photographs of naked minor boys that were recovered from REIDY's cellphone. REIDY identified V1 as one of the naked minors he photographed with his cellphone. REIDY stated that he never shared the photographs he took of the boys with anyone else. He stated that he took them for his own memory.

12. On or about February 26, 2020, the court in Siem Reap found REIDY guilty of Purchasing Child Prostitution and Possession of Child Pornography. On or about January 18, 2022, the Cambodian Appeals Court upheld REIDY's guilty verdict.

### SUMMARY CONCERNING CHILD PORNOGRAPHY, PERSONS WHO POSSESS AND COLLECT CHILD PORNOGRAPHY AND HOW USE OF

---

[3] On or about January 6, 2021, FBI personnel located at Legal Attaché (Legat) Phnom Penh received two forensic extractions of REIDY's cellphones (Samsung Galaxy J1 Mini and Samsung SGH-T769). FBI Legat personnel reviewed the forensic extractions of the Samsung Galaxy J1 Mini and Samsung SGH-T769 and identified multiple images and videos of child pornography involving boys approximately 14 years old.

## COMPUTERS AND THE INTERNET RELATES TO THE POSSESSION, RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY

13. Based on my investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who utilize the internet to view and receive images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals, including the following:

      a. Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

      b. Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

      c. Individuals who have a sexual interest in children or images of children frequently maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

      d. Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer or cellphone, and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or in online storage, email accounts or other online communication accounts, to enable the individual to view the collection, which is valued highly.

6

   e. Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. This data is typically in digital format, and often maintained on computers, cell phones and in online storage, email accounts or other online communication accounts.

   f. Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer to Peer networks and other online methods would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

   g. Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography. Consequently, individuals who have a sexual interest in children store their child pornography images in a variety of portable media and frequently maintain multiple computers, cellular phones, and portable digital storage devices such as "thumb" or "flash" drives to store their collections. Some portable media devices—particularly "thumb" or "flash" drives—are quite small, allowing them to be easily concealed.

   h. Moreover, in light of this desire not to be without their child pornography for any prolonged time period, individuals with a sexual interest in children sometimes store their collections or part of their collections on a cellular phone or cellular phones which they tend to carry with them on their person at their home and, when outside the home, virtually everywhere they go.

14. Based on my investigative experience related to computer and internet related child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned the following:

   a. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these on any scale also required significant resources. The photographs themselves were

somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

    b.  The development of computers, smartphones and the internet have added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers, smartphones and the internet serve four functions in connection with child pornography. These are production, communication, distribution, and storage.

    c.  Mobile devices such as laptop computers, smartphones, iPods, iPads and digital media storage devices are known to be used and stored in vehicles, on persons or other areas outside of the residence.

    d.  Smartphones have the capability to access the Internet and store information, such as videos and images. As a result, an individual using a smartphone can send, receive, and store files, including child pornography, without accessing a personal computer or laptop. An individual using a smartphone can also easily plug the device into a computer, via a USB cable, and transfer data files from one digital device to another. Many people generally carry their smartphone on their person.

    e.  Child pornographers can now transfer photographs from a camera onto a computer-readable format. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.

    f.  Child pornography can be transferred via electronic mail or through file transfer protocols (FTP) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), easy access to the Internet, and online file sharing and storage, the computer is a preferred method of distribution and receipt of child pornographic materials.

    g.  The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. Collectors and distributors of child pornography use online resources to retrieve and store child pornography, including services offered by Internet Portals such as AOL Inc., Yahoo, and Google, Inc., Facebook, Dropbox, Instagram, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services, file exchange services, messaging services, as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Email accounts, online storage accounts, and other online communication accounts allow users to save significant amounts of data, including email, images,

videos, and other files. The data is maintained on the servers of the providers, and is occasionally retained by the providers after the user deletes the data from their account.

       h.     In my recent investigative experience, as well as recent discussions with law enforcement officers, I know that individuals who collect child pornography are using email accounts, online storage accounts, and other online communications accounts to obtain, store, maintain, and trade child pornography with growing frequency, in addition to, or as an alternative to, the use of personal devices.

       i.     Based on traits shared by collectors, the use of email, online storage accounts, and other online communication accounts, and the increased storage capacity of computers and server space over time, there exists a fair probability that evidence regarding the distribution, receipt and possession of child pornography will be found in the TARGET DEVICE notwithstanding the passage of time.

       j.     In addition, computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.

       k.     When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

       l.     In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.

       m.     The storage capacity of personal computers has increased dramatically over the last few years. Common and commercially available hard drives are now capable of storing terabytes of data. With that amount of storage space, an individual could store thousands of video files and/or hundreds of thousands of image files.

       n.     Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Since the storage capacity of hard drives has increased dramatically over the last several years, it is more likely that the above-described information will be recovered during forensic analysis.

## DEFINITIONS

14. The following definitions apply to this affidavit and Attachment B:

   a. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

   b. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

   c. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

   d. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

   e. "Forensic Extraction," as used herein, refers to a forensically sound duplication of the contents of a mobile device. The forensic extraction is verified via hash, a particular type of cryptographic value or unique identifier calculated for a piece of data. Any changes made to the contents of the original file will cause a different hash value to be calculated.

   f. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   g. "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. IP addresses can be "dynamic," meaning that the internet service provider (ISP) assigns a different unique number to

10

a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

      h. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

      i. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

      j. "Records," "documents," and "materials," as used herein, include all information recorded in any form and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

      k. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

      l. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether stored in a permanent format.

## ELECTRONIC STORAGE & FORENSIC ANALYSIS

15. As described above and in Attachment B, this application seeks permission to search for records and information that might be found on the computers and cellular telephone described in Attachment A. Based on my knowledge, training, and experience, I know that electronic devices (and subsequently their forensic image) can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

      a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded

11

onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

16. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

12

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). I know from my training and experience that users can access social media sites like, Facebook and video chatting applications/software with both mobile phones and computers and which such access and evidence can remain on the devices. I also know that individuals typically store files on their devices that they upload to social media websites and it is easy to transfer saved image, video or other files from one device to another such as saving a file on a computer and transferring it to an external hard drive or SD card.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17. Statements made by REIDY and V1 show that REIDY used the devices described in Attachment A to produce child pornography while he was residing in Cambodia. Further, based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be on the devices described in Attachment A for at least the following reasons:

a. Based on my training and experience, as well as my discussions with others involved in child exploitation investigations, I know that computers and computer technology have revolutionized the way in which child exploitation offenses are committed.

b. Individuals who engage in child exploitation offenses, including the production of child pornography in violation of 18 U.S.C. § 2251(a) and (e), use the internet and computers to allow them to obtain and store child exploitation material and/or child-exploitation-related materials in a relatively secure and anonymous way. Individuals who have a sexual interest in children often maintain their child exploitation material and/or child-exploitation-related materials in a digital or electronic format in a safe, secure and private environment, such as a computer. These materials are often maintained for several years and are kept close by.

c. Individuals who engage in the foregoing criminal activity, in the event that they change computers, will often "back up" or transfer files from their old computers' hard drives to

14

that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

## CONCLUSION

18. Based on the foregoing facts, probable cause exists to believe that REIDY traveled to Cambodia and engaged in sexual acts with V1, then a minor under the age of 16, while residing there. Probable cause also exists to show that REIDY produced child pornography by taking images of sexually explicit conduct with V1 while he was a minor under the age of 18 with the intent of taking it with him to the United States. Further, probable cause exists to believe that contraband, evidence, fruits, and instrumentalities of these violations will be located on the electronic devices as described in Attachments A and B.

19. I therefore respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment A.

Respectfully submitted,

Scott Schoenhardt
Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and Fed. R. Crim. P. 41(d)(3) this 25th day of July, 2022.

HONORABLE MATTHEW J. MADDOX
UNITED STATES MAGISTRATE JUDGE